# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**HAYES A. JOHNSON, JR.,**

    **Plaintiff,**

    v.                                          Case No. 18-CV-1811

**JENNIFER DELVAUX,** *et al.***,**

    **Defendants.**

## DECISION AND ORDER

Plaintiff Hayes A. Johnson, Jr., a Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. § 1983. U.S. Magistrate Judge David E. Jones screened the complaint and allowed Johnson to proceed on Eighth Amendment claims against the defendants. (ECF No. 16.) After the case was reassigned to this court, the defendants moved for summary judgment. (ECF No. 42.) Johnson opposes the motion. (ECF No. 51.) The motion is fully briefed. The case was reassigned to this court upon Judge Jones's unavailability, and the parties have consented to the full jurisdiction of this court. (ECF No. 36, 37.) The motion is ready for resolution.

## BACKGROUND

The facts are taken from the defendants' proposed findings of fact (ECF No. 44) and their declarations in support (ECF Nos. 45–48). Johnson filed a response to the defendants' proposed findings of fact in which he contests only some

of the defendants' facts. (ECF No. 53.) He did not submit his own proposed findings of fact or an affidavit in support of his opposition, as Civil L. R. 56(b)(2)(B)(ii) & (C) require. For purposes of this decision, the court will deem admitted any of the defendants' proposed facts that Johnson has not properly contested. *See* Civil L. R. 56(b)(4); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."). Because Johnson's complaint is verified, however, the court will consider the contentions in the complaint as equivalent to an affidavit for purposes of this decision. *See Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013); *Ford v. Wilson*, 90 F.3d 245, 246–47 (7th Cir. 1996).

### A. The Parties

At all times relevant to this lawsuit Johnson was an inmate at Oshkosh Correctional Institution ("OCI"). (ECF No. 44, ¶ 1.) The court allowed him to proceed on claims against Corrections Unit Supervisor Jennifer Delvaux and Corrections Sergeants Brian Ewert and Alexander Hando, all of whom worked at OCI. (*Id.*, ¶¶ 2–4.)

### B. Housing Assignments at OCI

Delvaux, as the Unit Supervisor, is usually involved in inmate housing only in special circumstances, such as transgender or vulnerable inmates. (ECF No. 44, ¶ 14.) The Unit Sergeant decides which inmates are housed together. (*Id.*) The Unit Sergeant takes into account an inmate's stated concerns or preferences but

2

exercises his own judgment when deciding what housing assignments are appropriate. (*Id.*, ¶ 16.)[1]

Cell assignments are based on available bed space and the needs of OCI. (ECF No. 44, ¶ 15.) Inmates commonly do not get along with their cellmates and may request a specific roommate when there is an available bed, but not all housing requests can be honored. (*Id.*, ¶¶ 15, 17–18.) Frequent moves risk confusion amongst staff, security issues, and complications in meal and mail delivery. (*Id.*, ¶ 19.)

**C. Johnson's Cellmate and Housing Assignment**

On September 1, 2017, inmate Alonzo Mann, Jr., moved into the housing unit where Johnson had been since August 8, 2017. (ECF No. 44, ¶ 5.) The two remained cellmates until September 25, 2017. (*Id.*) Initially, they got along fine. Johnson believed Mann "was nice" and "was kind of saying that he was going to listen to me." (*Id.*, ¶ 6 (citing ECF No. 40 (Johnson Deposition) at 9:12–23).) At the time, according to the defendants, Mann had no correctional history in Wisconsin and had never served a previous prison sentence within the Wisconsin Department of Corrections. (*Id.*, ¶ 24.) Mann's bed assignment, however, shows that he was housed at Dodge Correctional Institution for about two months before coming to OCI. (ECF No. 48-2 at 2.) Nonetheless, it is undisputed that Mann had no special needs or restrictions in place and no conduct reports suggesting that he should not be housed

---

[1] It is not clear whether Ewert or Hando are unit sergeants or are shift sergeants assigned to a specific unit, nor is it clear whether the two positions are different. Nonetheless, their specific position does not affect the court's disposition.

3

with Johnson. (ECF No. 40, ¶¶ 25, 27.) None of the defendants observed any verbal or physical altercations between Johnson and Mann. (*Id.*, ¶ 26.)

At some point Mann began to watch his television at a high volume and leave the lights on when Johnson wanted to sleep. (ECF No. 44, ¶ 7 (citing ECF No. 40 at 13:9).) Johnson was also bothered by Mann's use of the cell toilet and became concerned that Mann would get the two in trouble by having a razor in the unit. (*Id.* (citing ECF No. 40 at 12:18–13:7, 14:21–15:13).) Before September 25, 2017, however, Mann did not assault or hurt Johnson, although he would occasionally bump into Johnson with his shoulder when walking by him in the cell. (*Id.*, ¶ 8 (citing ECF No. 40 at 46:6–49:7).)

At his deposition Johnson testified that he told Delvaux that Mann was "keeping me up and threatening me, is threatening me and keeping his music real loud." (ECF No. 44, ¶ 9 (quoting ECF No. 40 at 19:3–15).) He testified that he told Hando, Ewert, and other sergeants that Mann was "threatening me and talking about getting some of his gang member friends to jump me." (*Id.*, ¶ 10 (citing ECF No. 40 at 21:10–12).) Johnson further testified that he told each of the defendants on multiple occasions that he wanted to be moved to a different cell for his "health and safety." (*Id.*, ¶ 11 (citing ECF No. 40 at 19:16–25; 27:10–28:8; 29:19–20).)

While housed with Mann, Johnson told Delvaux and Ewert on multiple occasions that he did not get along with Mann. (ECF No. 44, ¶¶ 20, 31.) Delvaux told Johnson each time that he was allowed to move but had to find another inmate with whom he could live, or an empty bed, and had to talk to the Unit Sergeant.

4

(*Id.*, ¶ 20.) Delvaux and Ewert assert that Johnson did not inform either of them that Mann had threatened him or that he feared for his safety being in a cell with Mann. (*Id.*, ¶¶ 21, 29, 31.) Nor did Johnson submit a Special Placement Needs request to be separated from Mann. (*Id.*, ¶ 28.) Delvaux asserts that she "had no reason to believe there was any type of danger or risk posed by Johnson and Mann being housed in the same cell." (ECF No. 45, ¶ 15.) And both Ewert and Hando assert that there was nothing in Johnson or Mann's behavior that suggested that they ought to recommend a cell change or that there was a risk in housing them together. (ECF No. 44, ¶ 33 (citing ECF No. 46, ¶ 11 and ECF No. 47, ¶ 22).)

**D. September 25, 2017 Incident**

In his complaint Johnson alleges that on the morning of September 25, 2017, he submitted a written request to Ewert, who passed it on to Delvaux, in which he requested that Delvaux "please move my celly for my safety. He is talking about fighting me and getting some of his friends to fight me. If not can you move me on v-unit." (ECF No. 44, ¶ 12 (quoting ECF No. 1 at 3).) The note or request is not in the record. Later that day, Delvaux spoke with Johnson about the request, told him she would try to move him, and advised him to try and find a new cellmate to move in with. (*Id.*, ¶ 13 (citing ECF No. 40 at 35:25–37:15).)

The same day, Ewert worked in Johnson's housing unit on the first shift from 6:30am through 2:30pm, and Hando worked the second shift from 2:30pm to 10:30pm. (ECF No. 44, ¶¶ 34, 37.) Although he knew that Johnson was unhappy with his cell assignment, Ewert asserts that he had no reason to believe that "there

5

was any type of danger or risk created by allowing Johnson and Mann to share a cell." (*Id.*, ¶¶ 35–36 (citing ECF No. 46, ¶¶ 9, 16).)

That evening Johnson asked Hando if he could move cells. (ECF No. 44, ¶¶ 38–39 (citing ECF No. 40 at 40:9–42:22).) Hando recalls the conversation and remembers Johnson telling him that he had spoken with Delvaux and the first shift officers (which included Ewert), who told him that he would be moved if he found another inmate to live with. (ECF No. 47, ¶ 8.) Like Delvaux and Ewert, Hando asserts that Johnson did not tell him that Mann had threatened him or that he feared for his safety. (*Id.*) Hando, as the second shift sergeant, does have the authority to move an inmate to another cell, but for several reasons he typically waits to move an inmate until the first shift. (ECF No. 44, ¶¶ 42, 44–45.) Because Johnson's request did not appear urgent, Hando did not sense any danger in Johnson and Mann remaining cellmates, and no staff on the earlier shift had notified Hando of a cell transfer. Therefore, Hando denied Johnson's request to change cells but told Johnson that he would follow up with Delvaux. (*Id.*, ¶¶ 40–41, 43, 46–47.)

Later in the evening on September 25, 2017, Johnson and Mann were involved in a physical altercation. (ECF No. 44, ¶ 49.) None of the defendants were working at the time. (*Id.*) Johnson states in his complaint that, before going to sleep, he talked with Mann about keeping the light on at night. (ECF No. 1 at 4.) Johnson later awoke to "loud yelling and being hit in the face and head" by Mann. (*Id.*) Mann continued to hit Johnson as he attempted to sit up and get out of his bed,

6

spit on his arm, and kicked his legs. (*Id.*) Mann hit Johnson with a chair until Johnson fell off his bed to the floor, threw water in Johnson's face, and told Johnson, "I am going to kill your A--." (*Id.*) Another inmate responded to the noise and told Mann to open the door. (*Id.* at 5.) Mann opened the door, and Johnson ran out of the cell to the sergeant station, where a corrections officer (not a defendant) let Johnson remain for his safety. (*Id.*) A lieutenant (also not a defendant) asked Johnson about the attack and photographed his injuries. (*Id.*) Johnson eventually was taken for medical treatment and diagnosed with a concussion. (*Id.* at 6.) He was then housed in segregation for several weeks and later moved to a different unit building than Mann. (*Id.*; ECF No. 44, ¶ 49.) Because of the fight, both Johnson and Mann were issued major conduct reports. (ECF No. 44, ¶ 50.)

**E. Later Events**

Johnson's complaint alleges that he learned sometime after the assault (he does not explain how he learned) that Mann was classified as "MH2" or "AMH2," which according to Johnson signifies that Mann has a mental-health issue. (ECF No. 1 at 7.) No document in the record shows that Mann has this classification. Johnson states that OCI employees, including Delvaux, knew about Mann's MH2 classification before the attack. (*Id.* at 7–8.) Johnson states that Mann "should be tak[ing] meds for" his issues and "is known[n] to be [a] danger to his self and others." (*Id.* at 8.) Johnson asserts that "state living guidelines" for Wisconsin prisons "prohibit[] these inmates to be housed with other inmates." (ECF No. 53, ¶ 5.) But in support of that assertion he cites statements of the defendants and

7

exhibits showing only that Johnson and Mann were housed together between September 1, 2017, and September 25, 2017. (*Id.*)

On January 24, 2018, Johnson submitted a Special Placement Needs request while in segregation, asking that Mann be kept "away from him at all times." (ECF No. 44, ¶ 51; ECF No. 1 at 8.) At the time, Johnson lived in a different unit than the one in which the defendants work, and none of the defendants attest to having personal knowledge of, or access to, Johnson's request. (ECF No. 44, ¶¶ 51–52.)

Johnson states that in February 2018 Mann and another inmate harassed and threatened Johnson in OCI's library. (ECF No. 1 at 8; ECF No. 44, ¶ 53.) Neither Delvaux nor Ewert work in the prison library or witnessed the event. (ECF No. 44, ¶ 53.) Johnson reported the incident to the Oshkosh Police Department but did not report the incident to the defendants. (ECF No. 1 at 8; ECF No. 44, ¶ 54.) In his report submitted to the police he stated that he told Delvaux "that [he] feared for [his] safety and asked her several times to separate us." (ECF No. 52-1 at 10.) Johnson did not allege that Mann touched or physically harmed him during the library interaction. (ECF No. 44, ¶ 55.)

Johnson asserts that he made the defendants aware before the attack that he "became a victim of a bully as well as feared for his life." (ECF No. 53, ¶ 6.) But in support of that assertion, he cites only the Special Placement Needs request he submitted in January 2018, months after Mann attacked him. (*Id.* (citing ECF No. 52-1 at 15 ("Exhibit 21")).)

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## ANALYSIS

Johnson's claims that the defendants failed to protect him amount to a claim of deliberate indifference, which arises under the Eighth Amendment's prohibition of cruel and unusual punishments. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (quotations omitted) (noting that prison officials "must take reasonable measures to guarantee the safety of the inmates" and "to protect prisoners from violence at the hands of other prisoners").

"Yet, a prison official does not violate the Eighth Amendment every time an inmate gets attacked by another inmate." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008).

A prison official cannot be found liable under the Eighth Amendment unless he subjectively knows of an excessive risk of harm to an inmate's health or safety and disregards that risk. *Farmer*, 511 U.S. at 837; *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" does not amount to cruel and unusual punishment. *Farmer*, 511 U.S. at 838. A prison official's response to the inmate's concern "may be reasonable even if it fails to avert the harm." *Dale*, 548 F.3d at 569 (citing *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006)).

Inmate complaints "that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *See Gevas v. McLaughlin*, 798 F.3d 475, 480–81 (7th Cir. 2015) (citing several cases). But when an inmate's complaint "identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant," the court may infer that the prison official who received the complaint had actual knowledge of the risk to the inmate. *Id.* at 481 (citing *Haley v. Gross*, 86 F.3d 630, 643 (7th Cir. 1996))

It is undisputed that Johnson told all the defendants at least once that he did not get along with Mann and wanted to change cells. It is disputed, however, whether Johnson also told any defendant that he feared for his safety living with Mann or that Mann had threatened him. The defendants contend that they never

10

witnessed a physical or verbal altercation between Johnson and Mann. They assert that he repeatedly told them he did not like his cellmate but not that he felt threatened or in danger living with Mann. But Johnson testified that he told each defendant on multiple occasions, in writing and in person, not just that he did not get along with Mann but also that Mann threatened him. Although Johnson did not specify a specific date or time that Mann would attack him, he specified that Mann talked about having his "gang member friends" jump Johnson. As a result, Johnson feared for his health and safety, which he testified he also told the defendants. Johnson's testimony that he told the defendants about Mann's specific, imminent threat about jumping him was sufficient to notify the defendants of a substantial risk of serious harm to Johnson. *See Whaley v. Erickson*, 339 F. App'x 619, 622 (7th Cir. 2009) (citing *Brown v. Budz*, 398 F.3d 904, 914–15 (7th Cir. 2005)) ("We have found a substantial risk of serious harm where custodians know of threats to specific prisoners posed by a specific source . . . ."). Because the defendants were aware of that risk of harm but took no action to abate it, summary judgment is inappropriate on this claim.

However, Johnson cannot defeat summary judgment on his claim that the defendants failed to protect him from harassment by Mann in the library in February 2018. At the time Johnson no longer lived in the unit where the defendants work, and none of the defendants work in the prison library or have control over library security. Johnson has presented no evidence that the

11

defendants were in a position to protect him from any harassment by Mann in the library in February 2018.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (ECF No. 42) is **DENIED in part** and **GRANTED in part**. Johnson may proceed on his claim that the defendants failed to protect him from an imminent risk of serious harm by Mann in September 2017. He may not proceed on his claim that the defendants failed to protect him from harassment by Mann in the library in February 2018.

Dated at Milwaukee, Wisconsin this 30th day of March, 2020.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge